[Docket Nos. 99, 100, 101]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

RICHARD E. KAYE, individually and as Administrator and Administrator *ad prosequendum* of the Estate of Patricia Kaye, deceased,

Plaintiff,

v.

RICHARD H. NUSSEY, JR., D.O., *et al.*,

Defendants.

Civil No. 20-9413 (RMB/SAK)

**MEMORANDUM ORDER**

**RENÉE MARIE BUMB, Chief United States District Judge**

This is a wrongful death and survival action brought by Richard E. Kaye ("**Plaintiff**"), individually and in his capacity as Administrator of the Estate of Patricia Kaye, his late wife (the "**Decedent**"). Plaintiff asserts medical malpractice, negligent infliction of emotional distress, and loss of consortium claims under state law against (a) Richard H. Nussey, Jr., D.O., Domenic F. Coletta, M.D.,[1] Robert Cimino, M.D., and Victoria Nicholls, PA-C (the "**Individual Defendants**"), and (b) Cape Regional Medical Center, Inc., Cape Regional Health System, Inc., and Cape Emergency Physicians, PA (the "**Institutional Defendants**," and with the Individual Defendants,

---

[1] On October 3, 2022, the parties filed a Stipulation of Dismissal as to all claims asserted against Domenic F. Coletta, M.D. [Docket No. 105.] He was dismissed from this action accordingly.

"**Defendants**"). [*See generally* Second Am. Compl., Docket No. 43 ("**SAC**").] Plaintiff also asserts a federal claim under the Emergency Medical Treatment and Active Labor Act ("**EMTALA**"), 42 U.S.C. § 1395dd, *et seq.*, against the Institutional Defendants.[2] [*Id.*] Plaintiff's claims arise out of the allegedly negligent medical care provided to Decedent by Defendants at the Cape Regional Medical Center on July 26, 2018. [*Id.*] After seeking emergency care at the hospital that morning, Decedent was transferred to Cooper University Hospital later that evening, where she ultimately died early the next day. [*Id.*] This litigation soon followed.

The matter now comes before the Court upon the filing of three Motions for Summary Judgment by Defendants. [Docket Nos. 99, 100, 101.] First, Defendants Nicholls and Cimino and the Institutional Defendants seek summary judgment as to Plaintiff's claim for negligent infliction of emotional distress. [Docket No. 99.[3]] Second, the Institutional Defendants seek summary judgment as to the claims asserted against them, including the EMTALA claim. [Docket No. 100.[4]] And third, in the

---

[2] On August 20, 2021, the parties filed a Stipulation of Dismissal as to the EMTALA claim against Defendant Cape Emergency Physicians. [Docket No. 71.]

[3] On September 15, 2022, Defendant Nicholls filed her Motion for Summary Judgment as to Plaintiff's negligent infliction of emotional distress claim. Through their own Motion, Defendants Cape Regional Medical Center and Cape Regional Health System seek summary judgment as to such claim. [Docket No. 100.] On September 20, 2022, Defendants Cimino and Cape Emergency Physicians joined both Motions. [Docket No. 103.] But there is no indication that Defendant Nussey has joined either Motion or seeks summary judgment as to any of Plaintiff's claims.

[4] On September 15, 2022, Defendants Cape Regional Medical Center and Cape Regional Health System filed their Motion for Summary Judgment, [Docket No. 100], which Defendant Cape Emergency Physicians joined. See *supra* note 3.

alternative, Defendants Cape Regional Medical Center and Cape Regional Health System seek summary judgment as to their affirmative defense of charitable immunity pursuant to the New Jersey Charitable Immunity Act ("**NJCIA**"), N.J.S.A. § 2A:53A-8, which they contend limits their liability for Plaintiff's negligence and EMTALA claims and "caps" any damages that might be awarded hereafter. [Docket No. 101.] Plaintiff concedes that NJCIA limits the vicarious liability of Defendants Cape Regional Medical Center and Cape Regional Health System as to Plaintiff's negligence claims, but not as to the EMTALA claim. [Pl.'s Opp'n 3, Docket No. 106.] Otherwise, Plaintiff opposes the Motions. [Pl.'s Opp'ns, Docket Nos. 106, 107, 108.] As the motions are fully briefed, they are ripe for adjudication. The Court exercises subject matter jurisdiction over Plaintiff's EMTALA claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

Because genuine disputes of material fact exist concerning whether Plaintiff contemporaneously observed the Individual Defendants' alleged malpractice and injury to Decedent and whether Plaintiff suffered severe emotional distress, Defendants' Motions for Summary Judgment will be denied as to Plaintiff's claim for negligent infliction of emotional distress. Similarly, there is a genuine dispute concerning whether Defendants Cape Regional Medical Center and Cape Regional Health System breached their statutory obligation to stabilize Decedent prior to transferring her to Cooper University Hospital, so Defendants' Motion for Summary Judgment will be denied as to Plaintiff's EMTALA claim. Furthermore, there are

genuine fact disputes regarding whether the Individual Defendants acted with apparent authority as the agents of the Institutional Defendants, so Defendants' Motion for Summary Judgment will be denied as to Plaintiff's theory of vicarious liability for the Individual Defendants' alleged malpractice.

However, the Court will grant the Motion of Defendants Cape Regional Medical Center and Cape Regional Health System as to their affirmative defense of charitable immunity. Pursuant to NJCIA, the damages of a nonprofit entity organized exclusively for hospital purposes that is liable to a beneficiary who was harmed as a result of the negligence of the entity's agents cannot exceed $250,000. N.J.S.A. § 2A:53A–8. The Court concludes that the "cap" plainly limits recoverable damages for Plaintiff's negligence claims, as he concedes. [Pl.'s Opp'n 3, Docket No. 106.] For the reasons discussed below, the Court also concludes that § 2A:53A–8 limits recoverable damages for Plaintiff's EMTALA claim. Under § 1395dd(d)(2)(A), an individual who suffers harm as a direct result of an EMTALA violation is entitled to obtain those damages that are "available for personal injury under the law of the State in which the hospital is located." Because damages exceeding $250,000 would not be available if Plaintiff's EMTALA claim were brought as a malpractice claim under New Jersey law, the Court will limit the liability of Defendants Cape Regional Medical Center and Cape Regional Health System accordingly.

## I.

On March 15, 2018, Decedent, a 58-year-old woman, was admitted to the emergency department of Cape Regional Medical Center. [Pl.'s Statement of Material

Facts ¶ 1, Docket No. 108.]  On March 19, 2018, she underwent resection of the colon with formation of an end colostomy.  [*Id.*]  On July 10, 2018, she elected to have her colostomy "reversed" at Fox Chase Cancer Center.  [*Id.* ¶ 2.]  She soon experienced complications as a result of that surgery.

On the morning of July 26, 2018, complaining of pain and nausea and reporting a fever of 103.5˚ Fahrenheit, Decedent presented to the emergency department of Cape Regional Medical Center with her husband, Plaintiff.  [*Id.* ¶¶ 3–4.]  Upon arrival, Plaintiff electronically signed a treatment consent form, which indicated that all physicians at Cape Regional Medical Center are employed separately by Cape Emergency Physicians.[5]  [*Id.* ¶ 87; Defs.' Statement of Material Facts ¶ 2, Docket No. 100.]  The Individual Defendants were not employed by Defendants Cape Regional Medical Center or Cape Regional Health System during the relevant time period. [Defs.' Statement of Material Facts ¶ 16, Docket No. 100.]

After Decedent's arrival at the hospital, at 11:36 a.m., Decedent began receiving intravenously a 2,000 ml bolus of fluids.  [Pl.'s Statement of Material Facts ¶ 5, Docket

---

[5] The form reads as follows:

I understand that the physicians on the staff of Cape Regional Medical Center are not agents or employees of the medical center but, rather are independent physicians who have been granted the privilege of using its facilities for the care and treatment of their patients.  I HAVE READ THIS FORM OR HAD IT FULLY EXPLAINED TO ME.  I AM SATISFIED THAT I UNDERSTAND ITS CONTENTS AND SIGNIFICANCE.  I UNDERSTAND THAT THE PHYSICIANS PROVIDING MY CARE ARE NOT EMPLOYEES OR AGENTS OF THE HOSPITAL.

[Defs.' Statement of Material Facts ¶ 2, Docket No. 100.]

No. 108.]  Examining Decedent, Defendant Nicholls noted fever, chills, and lower abdominal pain and wrote that she was "critically ill with a high probability of imminent or life-threatening deterioration."  [*Id.* ¶¶ 6, 8.]  Decedent was soon administered an antibiotic and morphine.  [*Id.* ¶ 13.]  At 12:57 p.m. Decedent's procalcitonin, a biomarker, indicated possible sepsis, [*id.* ¶ 15], and a CT scan performed at 3:19 p.m. displayed "a 10 cm left lower quadrant gas containing abscess/fluid collection just distal to the prior ostomy site," [*id.* ¶ 17].  At 4:16 p.m., Defendant Nicholls noted a diagnosis: sepsis and postoperative intraabdominal abscess.  [*Id.* ¶ 19.]  Sepsis is considered to be, and was recognized as, an "emergency medical condition" under hospital policy and applicable law.  [*Id.* ¶¶ 75, 78, 79, 84.]  Rather than consulting a surgeon at Cape Regional Medical Center, Defendant Nicholls contacted Fox Chase Cancer Center to arrange for a transfer of Decedent back to the Philadelphia hospital for treatment by her original surgeon.  [*Id.* ¶¶ 20, 81.]  By 4:35 p.m., Decedent's lactate (a measure referring to the amount of lactic acid in one's blood and another indicator of sepsis) rose to a "critical lab value," or a value "representing an abnormal pathophysiologic state that may be life-threatening and may require corrective action" under hospital policy, and her condition continued to worsen thereafter.  [*Id.* ¶¶ 21–22, 25–26.]

Plaintiff testifies that, because he was told that an ambulance would not arrive until 10:00 p.m. to transport Decedent to Philadelphia, Plaintiff went home around 6:00 p.m. to collect some of Decedent's belongings for what he presumed would be an overnight stay at Fox Chase Cancer Center.  [Pl.'s Statement of Material Facts ¶ 28,

Docket No. 107.]  He returned to Cape Regional Medical Center at 7:30 p.m.  [*Id.* ¶ 29.]  Plaintiff was otherwise present with Decedent at the hospital throughout the course of "treatment."  When he returned at 7:30 p.m., he noticed that his wife's condition had deteriorated dramatically.  At Plaintiff's deposition, he testified that "[s]he was a pool of sweat, soaked from top to bottom"; that "[s]he was ice cold . . . her body freezing"; and that "[s]he couldn't even stand up[,] [s]he fell back in bed." [*Id.*]

At 7:52 p.m., Defendant Nicholls noted receiving a call from Fox Chase Cancer Center cancelling the transfer.  [Pl.'s Statement of Material Facts ¶ 28, Docket No. 108.]  A fellow at Fox Chase reportedly explained that the Philadelphia hospital, was too far away for Decedent to be transported safely given her septic condition.  [*Id.* ¶ 30.]  Defendant Nicholls then arranged for Decedent to be transferred via helicopter to Cooper University Hospital, where she was to be accepted into the intensive care unit.  [*Id.* ¶ 36.]  At 10:18 p.m. Decedent left Cape Regional Medical Center.  [*Id.* ¶ 38.] Plaintiff testifies that this was the last time he spoke with his wife.  [Pl.'s Statement of Material Fact ¶ 30, Docket No. 107.]  He further testified about a conversation just before the transfer occurred, in which his wife's condition was described as "unstable" and her blood pressure "low."  [*Id.* ¶ 30.]  Prior to her departure, Decedent was not evaluated by a surgeon, even though a surgeon was on call.  [Pl.'s Statement of Material Facts ¶¶ 39, 77, Docket No. 108.]  According to hospital records, Decedent was stable at the time of transfer, with septic shock listed as a potential risk of transfer, though the transfer form was generated at "1625," or 4:25 p.m., several hours before

Decedent was transferred. [*Id.* ¶ 40.] Transfer was completed via helicopter at 10:52 p.m. [*Id.* ¶ 51.]

Upon arrival at Cooper University Hospital, Decedent's condition worsened precipitously. By 11:00 p.m., Decedent was reportedly alert and oriented but experiencing severe abdominal pain and nausea. [*Id.* ¶¶ 53–54.] She was "globally pale, cool, and diaphoretic with some mottling," and it was painful for her to take a deep breath. [*Id.* ¶ 54.] She developed agonal respirations and was emergently intubated. [*Id.* ¶ 57.] After 11:30 p.m., Decedent was evaluated by a surgeon who noted Decedent's sepsis, organ failure, and severe acidosis; he indicated that chances of survival were minimal. [*Id.* ¶¶ 58–59.] Plaintiff was reportedly told around 1:00 a.m. that his wife would likely die and that it was "too late[,] [s]he got there too late." [Pl.'s Statement of Material Fact ¶ 39, Docket No. 107.] Despite efforts to stabilize her, Decedent suffered cardiac arrest and died at 2:44 a.m. on July 27, 2018. [Pl.'s Statement of Material Fact ¶ 60, Docket No. 108.]

After Decedent's death, Plaintiff missed four months of work and underwent grief counseling over the course of fourteen months. [Pl.'s Statement of Material Fact ¶ 44, Docket No. 107.] He experienced anxiety, chest pains, and trouble sleeping. [*Id.* ¶ 49.] He was diagnosed with grief, depression, anxiety, and inability to focus. [*Id.* ¶ 51.] He was prescribed anti-depressants and medication to control his anxiety. [*Id.* ¶¶ 45–46.] His counselor further noted that Plaintiff "showed little interest in moving forward in his life and mourned deeply throughout [his] sessions." [*Id.* ¶ 52.]

## II.

A motion for summary judgment will be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" only if it might impact the "outcome of the suit under the governing law." *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 261 (3d Cir. 2012). A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. *Id.* When deciding a motion for summary judgment, a court must construe the facts and inferences in the light most favorable to the nonmoving party. *Penn. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). A court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.

### A.

Defendants Nicholls and Cimino and the Institutional Defendants first move for summary judgment as to Plaintiff's claim for negligent infliction of emotional distress. They assert that no reasonable factfinder could conclude on this record that Plaintiff contemporaneously observed the alleged malpractice of the Individual Defendants or the injury Decedent suffered or that Plaintiff suffered severe emotional

distress. Questions of fact preclude summary judgment.

New Jersey courts recognize the tort of negligent infliction of emotional distress in the medical malpractice context. *See, e.g.*, *Giardina v. Bennett*, 545 A.2d 139, 143 (N.J. 1988) (endorsing negligent infliction of emotional distress claim against doctor where malpractice resulted in infant's stillbirth and extreme emotional distress suffered by the parents). Such claims can be either "direct," in which a person is the direct object of a tortfeasor's negligence and experiences resulting severe emotional distress, *see, e.g.*, *Strachan v. John F. Kennedy Memorial Hosp.*, 538 A.2d 346, 351 (1988) (permitting parents to recover from hospital for emotional distress of observing their son's corpse lying in bed, "with tubes in his body, his eyes taped shut, and foam in his mouth" for three days as a result of hospital's failure to honor their wishes and release his body), or "indirect," in which a person, not otherwise a direct object of the tortfeasor's negligence, experiences severe emotional distress as a "bystander" of the victim's injury, *see, e.g.*, *Portee v. Jaffee*, 417 A.2d 521, 522–23, 528 (N.J. 1980) (recognizing indirect claim against apartment building owners by mother who witnessed her son, who was trapped in an elevator shaft of the building, cry out for help, moan, flail his arms, and ultimately die as a result of the owners' negligence in maintaining building). *See also Gendek v. Poblete*, 654 A.2d 970, 972–73 (N.J. 1995) (providing an overview of New Jersey law of negligent infliction of emotional distress).

An indirect claim for negligent infliction of emotional distress requires a plaintiff to prove four elements: "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff

and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." *Portee*, 417 A.2d at 528. Ordinarily, to justify recovery, a plaintiff asserting an indirect claim must be present at the scene of the accident and must "witness the victim when the injury is inflicted or immediately thereafter." *Frame v. Kothari*, 560 A.2d 675, 643–44 (N.J. 1989). "Recovery for the negligent infliction of emotional distress is meant to cover the observation of shocking events that do not occur in the daily lives of most people." *Id.* (citing Note, *Limiting Liability for the Negligent Infliction of Emotional Distress: "The Bystander Recovery" Cases*, 54 S. CAL. L. REV. 847, 871 (1981)). Thus, to prevail, a plaintiff must have observed the kind of result associated with the aftermath of an accident, "such as bleeding, traumatic injury, and cries of pain." *Id.* at 644 (citing *Gates v. Richardson*, 719 P.2d 193, 199 (Wyo. 1986)).

In *Frame*, however, the court found that parents of an infant who died of an intra-cerebellar hemorrhage as a result of a physician's misdiagnosis could not recover for their emotional distress. *Id.* at 681. Their claim turned on a 2:00 p.m. telephone conversation in which the physician, who had earlier diagnosed the infant with a virus and sent the parents home, wrongly directed the parents to let the infant sleep for four more hours. *Id.* at 676–77. Taking his advice, the parents discovered their infant son in a moribund condition at 6:00 p.m. *Id.* at 677. "Eleven more hours elapsed before they learned through a telephone call from the hospital of his death." *Id.* at 681. "The chain of circumstances, although deeply tragic, [was] not 'shocking,'" the court

explained.  *Id.*  Nevertheless, the *Frame* court stated: "In an appropriate case, if a family member witnesses the physician's malpractice, observes the effect of the malpractice on the patient, and immediately connects the malpractice with the injury, that may be sufficient to allow recovery for the family member's emotional distress."  *Id.* at 649.

Here, there is no dispute regarding the first two elements of negligent infliction of emotional distress under *Portee*.  Rather, Defendants contend that Plaintiff cannot meet the last two elements, so summary judgment is warranted.  [Defs.' Br. 6–7, Docket No. 99-3.]  They argue that Plaintiff did not observe Defendant Nicholls' alleged malpractice or the effects of her negligence and did not immediately connect the alleged malpractice to Decedent's injury (i.e., death).  Additionally, they assert that Plaintiff's emotional distress was not sufficiently severe.  [*Id.* at 7–8.]

The Court does not agree.  First, there is a genuine dispute whether Plaintiff observed Defendant Nicholls' alleged malpractice and the resulting effects. Defendants stress the following facts: the Decedent's "treatment" occurred over the course of an entire day, not any one moment; that Decedent did not die until early the next day, hours after she presented to Cape Regional Medical Center; that Plaintiff did not accompany his wife during "much of the operative period," such as between 6:00 p.m. and 7:30 p.m. when he left the hospital to gather Plaintiff's belongings, 10:30 p.m. and 12:00 a.m. when he was driving to Cooper University Hospital, and the time he arrived there and 1:00 a.m., when he was permitted to see his wife; and that Plaintiff could not recall the name of Defendant Nicholls during his deposition, one of the providers he contends was negligent.  [Defs.' Br. 7, Docket No. 99-3.]  By contrast,

12

Plaintiff emphasizes that he accompanied his wife for nine and a half hours of the eleven hours she spent at Cape Regional Medical Center waiting for Defendants to properly treat her. [Pl.'s Opp'n 18–19, Docket No. 107.]  While he could not recall Defendant Nicholls' name, Plaintiff stresses the emergency nature of the situation and his lack of familiarity with the providers he encountered.  [*Id.*]  Moreover, Plaintiff indicates that he repeatedly voiced his concern about the providers' delay in treating his wife and witnessed her deteriorating condition contemporaneously, by her side. After all, he testified that, upon returning to Cape Regional Medical Center at 7:30 p.m., Plaintiff came upon his wife who was "a pool of sweat, soaked from top to bottom . . . She was ice cold." [Pl.'s Statement of Material Fact ¶ 29, Docket No. 107.] Because delay is at the core of Plaintiff's claim that Defendants' failed to treat or timely transfer Plaintiff, the Court concludes that a reasonable jury could find that he witnessed the malpractice alleged and its resulting effects.

Similarly, whether Plaintiff immediately connected the alleged malpractice with Decedent's injury is controverted.  On the one hand, the malpractice is alleged to have occurred at Cape Regional Medical Center and Decedent died at Cooper University Hospital a few hours after she was transferred there.  The malpractice and Decedent's death are temporally disconnected.  On the other hand, Plaintiff directly witnessed the Individual Defendants' "treatment" (and, indeed, delay of treatment) of Decedent, even if not for the entire operative period, and he was present at Cooper University Hospital when she died, staying with her body thereafter.  Following Decedent's transfer to the hospital, Plaintiff was told that it was "too late" to save her, and that

she should have been transferred earlier. Unlike in *Frame* where the relevant misdiagnosis occurred over the phone and the parents did not learn of their infant son's death until 5:00 a.m. the next day, 560 A.2d at 677, here Plaintiff voiced his concerns repeatedly about the delay in treatment and contemporaneously observed Decedent's worsening conditions. He arguably connected the Individual Defendants' alleged malpractice to Decedent's worsening condition when Cooper University Hospital staff reported that she was "too late." He also witnessed Decedent's death at the hospital. Because Plaintiff has put forward evidence from which a reasonable jury could conclude that Plaintiff observed the alleged malpractice and the resulting effects and immediately connected the malpractice with the injury, genuine disputes of fact preclude summary judgment.

Second, there is a genuine dispute as to whether Plaintiff suffered severe emotional distress due to the alleged malpractice resulting in Decedent's death. Defendants contend that Plaintiff sought counseling for only a few months following his wife's death and that he has not served an expert report demonstrating that he is currently suffering emotional distress. [*Id.* at 8.] Plaintiff, however, persuasively points to several physical manifestations of his psychic pain, including chest pain, insomnia, inability to focus, and anxiety. He was prescribed medication, and he ceased working for four months. Such symptoms could be found to be sufficiently severe to warrant recovery. *See, e.g.*, *Albrecht v. Williams*, 2009 WL 3296649, at *22 (D.N.J. Oct. 13, 2009) (explaining that treatment for anxiety, anguish, and distress resulting in diagnosis, therapy, and medication could demonstrate severe emotional

14

distress).  Accordingly, whether Plaintiff's emotional distress was in fact sufficiently severe is a question for the trier of fact, not this Court.  *See Buckley v. Trenton Sav. Fund Soc.*, 544 A.2d 857, 864 (N.J. 1988) ("the court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved.").  Questions of fact thus preclude summary judgment as to Plaintiff's negligent of infliction of emotional distress claim.

### B.

Next, the Court addresses the Institutional Defendants' motion for summary judgment as to Plaintiff's EMTALA claim and his theory of vicarious liability regarding his medical malpractice claims.[6]  First, the Institutional Defendants argue that no reasonable jury could conclude that Cape Regional Medical Center or Cape Regional Health System failed to stabilize Decedent prior to transferring her to Cooper University Hospital.  [Defs.' Br. 19, Docket No. 100.]  They indicate that Decedent's vital signs improved or remained stable during the entirety of her visit to Cape Regional Medical Center and up to the moment of transfer, and that they did not have an obligation under the statute to cure Decedent's emergency medical condition, only to have ensured that no material deterioration of her condition was reasonably likely prior to transferring her to another hospital.  [*Id.* at 19–20.]  Plaintiff argues that summary judgment should be precluded because the sole issue before the Court is a

---

[6] The Court need not analyze anew whether the Institutional Defendants' Motion for Summary Judgment as to Plaintiff's negligent infliction of emotional distress claim should be granted.  For the reasons already discussed, it should not.

factual one: whether Decedent was in fact "stabilized" within the meaning of the statute prior to transfer.  [Pl.'s Opp'n 28, Docket No. 108.]

Pursuant to 42 U.S.C. § 1395dd (EMTALA), participating hospitals are required to provide certain types of medical care to individuals who present for emergency treatment: "(a) appropriate medical screening, (b) stabilization of known emergency medical conditions and labor, and (c) restrictions on transfer of unstabilized individuals to outside hospital facilities." *Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 172 (3d Cir.) (citing § 1395dd(a)–(c)), *amended by*, 586 F.3d 1011 (3d Cir. 2009).  If the hospital determines that an individual presents with an "emergency medical condition"[7] pursuant to the medical screening requirements of the statute, then the hospital must provide one of the following: "(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition"; or "(B) for transfer of the individual to another medical facility in accordance with subsection (c)."  42 U.S.C. § 1395dd(b)(1).  Under subsection (c), a hospital may not transfer an individual with an

---

[7] An "emergency medical condition" is a defined phrase under EMTALA.  In pertinent part, it means:

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

    (i)     placing the health of the individual . . . in serious jeopardy,

    (ii)    serious impairment to bodily functions, or

    (iii)   serious dysfunction of any bodily organ or part[.]

42 U.S.C. § 1395dd(e)(1)(A)(i)–(iii).

emergency medical condition that has not been stabilized, subject to a few exceptions. *Id.* § 1395dd(c)(1). An emergency medical condition is "stabilized" within the meaning of EMTALA if "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(B). The exceptions: generally, a hospital *may* transfer an individual whose emergency medical condition has not been stabilized if (i) the individual consents in writing, or (ii) a physician certifies at the time of transfer that "the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual," or (iii) another qualified medical professional so certifies after consulting with a physician. *See id.* § 1395dd(c)(1)(A).

Plaintiff contends that Decedent was transferred to Cooper University Hospital while she was unstable. The Institutional Defendants do not argue that any of the exceptions applies. A failure-to-stabilize claim requires Plaintiff to prove that (1) Decedent had an emergency medical condition, (2) the Institutional Defendants actually knew of that condition, and (3) Decedent was not stabilized before being transferred. *See Torretti*, 580 F.3d at 178 (citing *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 883 (4th Cir. 1992)). The parties do not dispute that Cape Regional Medical Center appropriately screened Decedent, that she presented to its emergency department with an "emergency medical condition" (i.e., sepsis), that Defendants discovered and knew of that condition, and that Defendants "transferred" Decedent within the meaning of the statute. The sole dispute concerns the third element, i.e.,

17

whether Defendants Cape Regional Medical Center and Cape Regional Health System transferred Decedent while she was unstable.  [SAC ¶ 154; *see also* Defs.' Br. 13, Docket No. 100; Pl.'s Opp'n 28, Docket No. 108.]  Defendants believe that no reasonable jury could conclude that Decedent was transferred while unstable.

The Court does not agree.  Plaintiff has pointed to credible evidence that demonstrates this element is genuinely disputed.  For instance, Plaintiff has pointed to facts that have a tendency to show that Decedent was unstable at the time of transfer. Almost immediately after Decedent presented to Cape Regional Medical Center for treatment, Defendant Nicholls documented her "high probability of imminent or life[-]threatening deterioration."   Tests revealed elevated lactate levels (a "critical lab value"), and by 7:30 p.m., Decedent was "a pool of sweat" and unable to stand up. The transfer form that was produced nearly six hours before transfer even indicated that a potential risk of transfer was septic shock.  Upon arrival at Cooper University Hospital, Decedent suffered septic shock and developed agonal respirations and was emergently intubated.  Her condition worsened precipitously.  The frequency with which Decedent's condition deteriorated at, and in connection with, transfer is some evidence supporting the proposition that she was unstable at the time of transfer. Moreover, proving the third element of a failure-to-stabilize claim typically requires the factfinder to consider and weigh expert testimony.  *See Smith v. Botsford Gen. Hosp.*, 419 F.3d 513, 519 (6th Cir. 2005) (observing that compliance with EMTALA's stabilization requirements entails consideration of medical judgment that is understood by the trier of fact only through expert testimony).  Here, Plaintiff has

produced experts who opine that Decedent's sepsis was worsening before transfer and was likely to deteriorate further as a result of transfer. [Pl.'s Statement of Material Fact ¶¶ 62–74, Docket No. 108 (citing Ops. of Drs. Borczuk, Novitsky, & Polsky).] Plaintiff has persuasively argued that such testimony should be presented to a jury.

Furthermore, summary judgment is not warranted even though the Institutional Defendants are correct that they were under no obligation to cure Decedent's condition. *See Torres Nieves v. Hosp. Metropolitano*, 998 F. Supp. 127, 133 (D.P.R. 1998) ("While EMTALA imposes a duty to stabilize a patient, it does not impose a duty to fully cure an emergency condition before transferring or discharging a patient. The standard is clear from the statute: if no material deterioration of the patient's emergency medical condition is likely to result within reasonable medical probability as a result of the transfer, then the patient has been stabilized and no EMTALA violation has occurred."). The Institutional Defendants' reliance on Decedent's consistent vital signs is some evidence of her condition's stability at the time of transfer, but it is not sufficient for summary judgment. The trier of fact must weigh the competing narratives of the parties and judgments of their experts to determine whether a violation of the statute occurred. *See Love v. Rancocas Hosp.*, 2005 WL 1541052, at *6 (D.N.J. June 29, 2005) (Irenas, J.) (denying summary judgment as to failure-to-stabilize claim where plaintiff produced expert reports discussing her high and unstable blood pressure readings, syncope, and repeated falls prior to transfer).

Second, the Court addresses the Institutional Defendants' argument that summary judgment is warranted as to Plaintiff's theory of vicarious liability for his

state law claims.   Defendants Cape Regional Medical Center and Cape Regional Health System contend that they cannot be held liable for the alleged malpractice of the Individual Defendants because they were acting as independent contractors for the hospital, not its employees.[8] [Defs.' Br. 21, Docket No. 100.] They argue that Plaintiff and Decedent were on notice of this fact.   [*Id.* at 24.]   Plaintiff contends that Cape Regional Medical Center and Cape Regional Health System are vicariously liable for the negligence of the Individual Defendants under the doctrine of apparent authority, as Decedent reasonably believed that the Individual Defendants acted on their behalf. [Pl.'s Opp'n 33, Docket No. 108.]  Thus, at issue is whether the Individual Defendants acted with the apparent authority of the hospital.

Under the long-settled rule, a principal is immune from liability for the acts of an independent contractor in the performance of contracted services. *Basil v. Wolf*, 935 A.2d 1154, 1169 (N.J. 2007).   The rule applies to hospitals and their independent physicians.  *See Arthur v. St. Peters Hosp.*, 405 A.2d 443, 445 (N.J. Super. Ct. Law Div.

---

[8] The Court notes that, while Cape Emergency Physicians appears to have joined the Motion of Cape Regional Medical Center and Cape Regional Health System as to such argument, see *supra* notes 3 & 4, Cape Emergency Physicians has not explained how its liability would be precluded where it *employs* the Individual Defendants as employees and contracts with the other Institutional Defendants. Under the doctrine of *respondeat superior*, Cape Emergency Physicians is liable for the torts of its employees that are committed within the scope of their employment. *See, e.g.*, *Carter v. Reynolds*, 815 A.2d 460, 463 (N.J. 2003) ("Under *respondeat superior*, an employer can be found liable for the negligence of an employee causing injuries to third parties, if, at the time of the occurrence, the employee was acting within the scope of his or her employment."). Accordingly, the following discussion concerning apparent authority is not relevant to the vicarious liability of Cape Emergency Physicians.

1979) ("The general rule of immunizing persons from vicarious liability for the negligent acts of independent contractors has been applied equally to hospitals."). However, exceptions to the rule are similarly well-settled.  *See Basil*, 935 A.2d at 1170 ("Liability may be imputed to a principal for the actions of independent contractors: (1) where the principal retains control of the manner and means of doing the work that is the subject of the contract; (2) where the principal engages an incompetent contractor; or (3) where the activity constitutes a nuisance per se.") (citation omitted).

Another exception to the general rule immunizing the principal from liability for the torts of the independent contractor is when the principal holds out the independent contractor as the principal's agent or employee.  In such cases, the principal will be vicariously liable for the agent's negligence on the basis of apparent authority.  "[A]pparent authority imposes liability on the principal 'not as the result of the reality of a contractual relationship but rather because of the actions of a principal or an employer in somehow misleading the public into believing that the relationship or the authority exists.' "  *Basil*, 935 A.2d at 1172 (quoting *Arthur*, 405 A.2d at 446).

A hospital will be vicariously liable for its independent physicians under the doctrine of apparent authority where "it can be shown that [the] hospital, by its actions, has held out a particular physician as its agent and/or employee and that a patient has accepted treatment from that physician in the reasonable belief that it is being rendered in behalf of the hospital."  *Id.*  A hospital can "hold out" an independent physician as its agent without "actively misrepresenting the doctor's agency or affirmatively misleading the patient."  *Cordero v. Christ Hosp.*, 958 A.2d 101,

105 (N.J. Super Ct. App. Div. 2008). When a hospital provides a doctor for its patient and "the totality of the circumstances created by the hospital's action and inaction would lead a patient to reasonably believe that the doctor's care is rendered on behalf of the hospital, the hospital has held out that doctor as its agent." *Id.* at 107–08. In such cases, a patient is entitled to a rebuttable presumption that the doctor is rendering services on behalf of the hospital. The hospital can rebut this presumption by demonstrating that it took affirmative steps to dispel the reasonable belief that a doctor provided for a patient's care acts as the hospital's agent. *See id.*

The *Cordero* court provided six circumstances to consider in determining whether the hospital's conduct would lead a patient to reasonably believe that the doctor acts on the hospital's behalf:

(1) Whether the hospital supplied the doctor;

(2) The nature of the medical care and whether the specialty, like anesthesiology, radiology[,] or emergency care, is typically provided in and an integral part of medical treatment received in a hospital;

(3) Any notice of the doctor's independence from the hospital or disclaimers of responsibility;

(4) The patient's opportunity to reject the care or select a different doctor;

(5) The patient's contacts with the doctor prior to the incident at issue; and

(6) Any special knowledge about the doctor's contractual arrangement with the hospital.

*Id.* at 108.

Here, there is clearly a factual dispute about whether the hospital's conduct led Decedent to reasonably believe that the Individual Defendants were acting on its behalf. While the Institutional Defendants note that Plaintiff signed a treatment

consent form that indicates the emergency department physicians at Cape Regional Medical Center are not its agents or employees, Decedent did not sign such form, and there is no evidence to suggest that Plaintiff signed the form on her behalf. Defendants argue that Decedent signed an identical form a few months earlier, so she was on notice that the physicians were not employed by the hospital and, thus, they could not be vicariously liable for the Individual Defendants' negligence. [Defs.' Br. 24, Docket No. 100.] Still, Plaintiff argues that Decedent presented to the emergency department in crisis and had no choice in selecting her physician. [Pl.'s Opp'n 36, Docket No. 108.] She further argues that emergency services are at the core of medical treatment provided at a hospital. [*Id.*] Decedent had no opportunity to reject the services of the Individual Defendants, and she had no prior contact with them. [*Id.* at 37.]

Ultimately, whether it was reasonable for Decedent to believe that the Individual Defendants were endowed with the apparent authority of the Institutional Defendants is a question for the trier of fact. *See Gizzi v. Texaco, Inc.*, 437 F.2d 308, 310 (3d Cir. 1971) ("Questions of apparent authority are questions of fact and are therefore for the jury to determine."). Considering the record as a whole and the totality of the circumstances, a reasonable jury could conclude that the Institutional Defendants are vicariously liable for the malpractice of the Individual Defendants under the doctrine of apparent agency.

## C.

Finally, the Court addresses whether the New Jersey Charitable Immunity Act (NJCIA) limits the potential damages of Defendants Cape Regional Medical Center

and Cape Regional Health System should a jury find that they violated the Emergency Medical Treatment and Active Labor Act (EMTALA).  The Court need not discuss in depth whether NJCIA limits their damages in the event a jury finds that they are vicariously liable for the negligence of the Individual Defendants, as the parties agree that Plaintiff's negligence claims are within the scope of N.J.S.A. § 2A:53A–8.  [Defs.' Br. 6–7, Docket No. 101; Pl.'s Opp'n 3, Docket No. 106; Defs.' Reply Br. 1–2.]  Thus, the Court will limit their damages accordingly.  The following discussion focuses on EMTALA only.

In 1986, Congress enacted EMTALA to address concerns that hospitals, due to economic constraints, were refusing to treat certain persons with emergency medical conditions or transferring them to other institutions, especially where such persons lacked health insurance.  *Torretti*, 580 F.3d at 173.  The practice was known as "patient dumping."  *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994).  In response, Congress required hospitals to provide medical screening and stabilizing treatment to all individuals who present to emergency departments for care, and it empowered aggrieved individuals to bring private civil actions to recover damages. *Torretti*, 580 F.3d at 173.  While an EMTALA action is distinct from a medical malpractice action under state law, *id.* at 173–74 ("[EMTALA] does not create a federal cause of action for malpractice"); *id.* (explaining that EMTALA and medical malpractice under state law require a plaintiff to prove different elements), EMTALA specifically authorizes any individual who suffers personal harm as a direct result of a hospital's violation of the statute to "obtain those *damages available for personal injury*

under the law of the State in which the hospital is located," 42 U.S.C. § 1395dd(d)(2)(A) (emphasis added).  The question presented in the instant case is whether EMTALA's civil enforcement provision incorporates the damages cap imposed by NJCIA.  A brief review of the state law provision is in order.

In New Jersey, charitable institutions such as schools and churches are generally immune from liability for negligence actions.  N.J.S.A. § 2A:53A–7.  However, nonprofit hospitals are "granted a cap on damages from liability rather than immunity." *Kuchera v. Fam. Health Ctr.*, 111 A.3d 84, 89 (N.J. 2015).  NJCIA thus distinguishes between nonprofit entities organized exclusively for charitable, religious, or educational purposes—that are *immune* from liability for negligence actions—and nonprofit entities that are organized exclusively for hospital purposes—that are subject to liability for negligence but entitled to a cap on damages. *Id.*  Specifically, N.J.S.A. § 2A:53A–8 provides that:

> Notwithstanding the provisions of the [N.J.S.A. § 2A:53A–7], any nonprofit corporation, society or association organized exclusively for hospital purposes shall be liable to respond in damages to such beneficiary who shall suffer damage from the negligence of such corporation, society or association or of its agents or servants to an amount not exceeding $250,000, together with interest and costs of suit, as the result of any one accident and to the extent to which such damage, together with interest and costs of suit, shall exceed the sum of $250,000 such nonprofit corporation, society or association organized exclusively for hospital purposes shall not be liable therefor.

Accordingly, in New Jersey, a plaintiff may not recover more than $250,000 from a nonprofit hospital in a civil action based on the negligence of the hospital's agents or employees.  Damages in excess of the cap are not available under state law.  Here, the

parties do not dispute that Defendants Cape Regional Medical Center and Cape Regional Health System are nonprofit entities that are organized exclusively for hospital purposes. The only question is whether EMTALA incorporates § 2A:53A–8.

While the Third Circuit has not squarely addressed whether EMTALA incorporates state-imposed limitations on damages, other circuit courts have. For instance, in *Power*, the Fourth Circuit considered whether a Virginia cap on medical malpractice damages applied to a failure-to-screen action under EMTALA. *Power*, 42 F.3d at 854. The court found that it did. *Id.* at 864. EMTALA requires federal courts to look to state law to determine the type and amount of damages available, the court began. *Id.* at 860. To determine whether a state law limitation (such as a malpractice damages cap) applies, a court must consider how the EMTALA claim would be construed if brought under state law. *Id.* at 860–61. Finding that the plaintiff's EMTALA claim would be deemed a malpractice claim, the *Power* court next considered whether the damages cap applied. *Id.* at 862. Reasoning that it did, the *Power* court interpreted the text of § 1395dd(d)(2)(A)—"damages available for personal injury"—to mean "the amount of damages for which recovery is permitted." *Id.* This reading reflects "Congress' deliberate choice of the more inclusive phrase 'personal injury' so that it would not be necessary to delineate each and every type of limitation on damages," the court stated. *Id.*

Furthermore, the *Power* court explained that its reading was supported by the legislative history of the civil enforcement provision, which included no limitation in

the original text of the bill. *Id.* at 862 n.9 (citing H.R. Rep. No. 241, 99th Cong., 1st Sess., pt. 3, at 3). However, the House Committee on the Judiciary expressed concerns that "if penalties are too severe, some hospitals, particularly those located in rural or poor areas, may decide to close their emergency rooms entirely rather than risk the civil fines [and] damages awards . . . that might ensue." H.R. Rep. No. 241, 99th Cong., 1st Sess., pt. 3, at 6. The Committee also questioned "the potential impact of these enforcement provisions on the current medical malpractice crisis." *Id.* As the *Power* court observed, the Conference Committee took these concerns into account and modified the House Bill to clarify the application of the civil enforcement provision. *Power*, 42 F.3d at 862. "Clarify[ing] its application," the Conference Committee wrote: "the courts are directed, on the issue of damages, to apply the law of the State in which the violating hospital is located, for actions brought by a harmed individual." H.R. Conf. Rep. No. 453, 99th Cong., 1st Sess., at 476. The limiting language added—"damages available for personal injury"—reflects an effort to preserve "state-enacted ceilings on the amount of damages that could be recovered" under EMTALA, the *Power* court explained. *Id.* (citing *Reid v. Indianapolis Osteopathic Med. Hosp., Inc.*, 709 F. Supp. 853, 855 (S.D. Ind. 1989); *Lee v. Alleghany Regional Hosp. Corp.*, 778 F. Supp. 900, 903–04 (W.D. Va. 1991)).

Similarly, in *Smith*, the Sixth Circuit considered whether EMTALA incorporated a Michigan law limiting noneconomic damages in a malpractice action to $395,000. *Smith*, 419 F.3d at 517. Like in *Power* and in the case at bar, the *Smith* plaintiff argued that if Congress had intended to incorporate state damages caps, it

would have done so explicitly.  *Id.*  Rejecting the argument, the *Smith* court relied on the reasoning articulated in *Power* and joined the "majority of courts addressing the issue in finding that EMTALA's incorporation of state law extends to caps on damages."  *Id.* (citing cases).  The court next considered whether the plaintiff's EMTALA failure-to-stabilize claim should be construed as a medical malpractice claim under Michigan law.  *Id.* at 518–19.  Concluding that the failure-to-stabilize claim, like a medical malpractice claim, entails medical judgment and the testimony of expert witnesses, the court held that Michigan's cap on malpractice damages applied and limited the plaintiff's non-economic damages.  *Id.* at 519.

Here, this Court concludes that the cap on damages contemplated by N.J.S.A. § 2A:53A–8 extends to Plaintiff's failure-to-stabilize claim under EMTALA.  Plaintiff has already conceded that the state law limitation applies to his medical malpractice claims, as such claims are professional negligence claims plainly within the ambit of § 2A:53A–8.  [Pl.'s Opp'n 3, Docket No. 106.]  Even though a failure-to-stabilize claim under EMTALA is not a negligence claim *per se*, *Torretti*, 580 F.3d at 173–74, the underlying conduct that forms the basis of Plaintiff's claims against Defendants Cape Regional Medical Center and Cape Regional Health System is integrally connected to the Individual Defendants' alleged malpractice and involves medical judgment and consideration of expert testimony to determine whether the Decedent was "stabilized."  *See Smith*, 419 F.3d at 519 ("compliance with EMTALA's stabilization requirements entails medical judgment . . . understood . . . only through expert testimony).  Like the *Power* and *Smith* courts that determined the EMTALA claims

28

alleged in both cases would constitute a malpractice action if brought under state law, *Power*, 42 F.3d at 861 ("Power's EMTALA claim would be deemed a malpractice claim under the Virginia Medical Malpractice Act, despite the fact that it does not allege a breach of the prevailing professional standard of care generally associated with a malpractice claim."); *Smith*, 419 F.3d at 519 (finding that EMTALA claim would constitute malpractice action under Michigan law based on broad interpretation of malpractice and the defining need for expert testimony to state a claim), this Court determines that Plaintiff's EMTALA claim would be deemed a malpractice action if brought under New Jersey law.  Plaintiff's EMTALA claim is "essentially negligence based" and would fall "within the scope of common law negligence."  *See Ptaszynski v. Atl. Health Sys., Inc.*, 111 A.3d 111, 121 (N.J. Super. Ct. App. Div. 2015) ("When a plaintiff's cause of action is based on a statute, and the defendant alleges that it is entitled to immunity under the [NJ]CIA, the claims must be reviewed to determine whether the conduct that is statutorily prohibited falls within the scope of common law negligence[,] . . . whether plaintiff's [] claims are essentially negligence-based.").  Just as expert testimony is critical to understanding whether an individual who presents to a hospital with an emergency medical condition was "stabilized" within the meaning of EMTALA at the time of transfer, *see Smith*, 419 F.3d at 519, expert testimony is typically required in malpractice cases in New Jersey for the trier of fact to determine whether a medical provider breached a duty of care, *see, e.g.*, *Rosenberg v. Cahill*, 492 A.2d 371, 374 (N.J. 1985) (explaining that in ordinary medical malpractice cases, the standard of practice to which the defendant-doctor failed to adhere must be

proved by expert testimony).  This Court concludes that Plaintiff's failure-to-stabilize claim would constitute a malpractice claim if brought under New Jersey law, notwithstanding the fact that the claim does not require Plaintiff to prove the elements of professional negligence here.

Accordingly, just as a malpractice claim is subject to the cap on damages identified in § 2A:53A–8, *see, e.g., Stegmeier v. St. Elizabeth Hosp.*, 571 A.2d 1006, 1008 (N.J. Super. Ct. App. Div. 1990) (reducing jury verdict entered against hospital pursuant to § 2A:53A–8 in medical malpractice action); *Young v. United States*, 190 F.Supp.3d 378, 379 (D.N.J. 2016) (limiting liability of United States pursuant to § 2A:53A–8 for medical malpractice claim asserted in Federal Tort Claims Act action against a federally qualified health center), Plaintiff's failure-to-stabilize claim shall be similarly limited.  Plaintiff may only "obtain those damages available for personal injury" under New Jersey law, and damages in excess of $250,000 are not "available" pursuant to § 2A:53A–8.  Therefore, if a jury finds that Defendants Cape Regional Medical Center and Cape Regional Health System violated EMTALA, any damages awarded to Plaintiff will be limited to $250,000.

## IV.

For the reasons expressed above, and for good cause shown,

**IT IS** on this **26th** day of **April 2023** hereby:

1.      **ORDERED** that the Motion for Summary Judgment filed by Defendant Nicholls [Docket No. 99] is **DENIED**; and it is further

2.       **ORDERED** that the Motion for Summary Judgment filed by Defendants Cape Regional Medical Center and Cape Regional Health System [Docket No. 100] is **DENIED**; and it is further

3.       **ORDERED** that the Motion for Summary Judgment filed by Defendants Cape Regional Medical Center and Cape Regional Health System as to their affirmative defense of charitable immunity [Docket No. 101] is **GRANTED**; and it is finally

4.       **ORDERED** that the liability of Defendants Cape Regional Medical Center and Cape Regional Health System for any violation of EMTALA that may be found hereafter, and any damages that may be awarded to Plaintiff therefor, shall be limited to $250,000 pursuant to N.J.S.A. § 2A53A–8.

<u>**s/Renée Marie Bumb**</u>
RENÉE MARIE BUMB
Chief United States District Judge